**Irving WEINRAUB et al., Plaintiffs,**

v.

**INTERNATIONAL BANKNOTE COMPANY, INC., et al., Defendants.**

No. 75 Civ. 5683 (CHT).

United States District Court,
S. D. New York.

Oct. 19, 1976.

Clune, Burns, White & Nelson, Harrison, N. Y., for plaintiffs; J. Russell Clune, William Greenberg, Harrison, N. Y., of counsel.

Simpson Thacher & Bartlett, New York City, for defendants; Melvyn L. Cantor, John J. Poggi, Jr., New York City, of counsel.

## MEMORANDUM

TENNEY, District Judge.

This is an action charging defendants with violations of federal securities laws

and common law principles regarding misrepresentations and material omissions allegedly made by defendants to plaintiffs in connection with a 1969 acquisition by defendant B. T. Babbitt, Inc. ("BTB")[1] of the stock in three companies owned by plaintiff.

Defendants have moved: (a) for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the complaint on the ground that no genuine issue exists as to any material fact in this case by reason of a general release executed by plaintiffs on or about January 1, 1971; (b) for judgment pursuant to Rule 12(b) of said Federal Rules of Civil Procedure dismissing plaintiffs' claim under Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, as time-barred by Section 13 of said act, 15 U.S.C. § 77m; and (c) for an order granting to defendants their costs and disbursements including reasonable attorneys' fees. For the reasons set forth hereinafter, the motions are denied.

It appears that in 1968 BTB had embarked on a program of acquisition of companies in the insurance field, having in that year acquired Jos. Halberstadt & Co., Inc., later known as Halberstadt Corp., which was primarily engaged in placing general and life insurance. Plaintiffs, together with another individual ("the outside stockholder"), were the owners of all the issued and outstanding stock in Weinschel Company, Inc., Manhattan Securities, Inc. and White House Agency, Inc. ("plaintiffs' companies"). As part of a program to expand its activities in the insurance field, BTB entered into an agreement on November 17, 1969 (the "1969 Agreement") with plaintiffs and plaintiffs' companies. Having theretofore acquired the stock held by the outside stockholder, plaintiffs agreed to exchange all of the issued and outstanding stock in the three plaintiffs' companies for shares of stock in BTB, including 75,000 shares to be held in escrow. (Exhibit B, Defendants' motion papers). It was anticipated that the plaintiffs' companies would amplify and complement the activities of Halberstadt Corp. by providing added volume in general and life insurance, and by introducing new expertise in the areas of accident and health insurance, group plans, pension planning, and mutual fund sales. However, these expectations did not materialize, and it seems that by mid-1970 BTB, and plaintiffs as well, were dissatisfied with the business result of the 1969 Agreement.

During a meeting at BTB's office in the late summer of 1970, Murray Rafsky, Esq., an attorney acting on behalf of plaintiffs, presented to defendant Barry Hirsch, then Vice President, Secretary, General Counsel and a Director of BTB, a copy of a letter signed by plaintiff Earl Adler on behalf of all the plaintiffs. The letter contained plaintiffs' demand for rescission and for the first time asserted the claims that are the subject of the complaint in this securities fraud action. Indeed, in contending that there had been a fraudulent inducement to enter the 1969 Agreement, the plaintiffs in their August 31, 1970 letter use language remarkably similar to paragraph 43 of the instant complaint.

On being shown the letter, Hirsch indicated to Rafsky that while he felt plaintiffs' contentions were without merit, any resulting litigation would no doubt be costly and time-consuming and that perhaps it would be well to discuss the possibility of an amicable resolution. The assertions contained in the letter of August 31, 1970 must certainly have been within the contemplation of the parties during the ensuing negotiations. Those negotiations culminated in an agreement dated January 1, 1971 (the "1971 Agreement") between BTB and all of the plaintiffs herein. (Exhibit D, Defendants' motion papers). Pursuant to the 1971 Agreement, BTB returned to plaintiffs all of the issued and outstanding stock of two of the three companies it had previously acquired from plaintiffs, and further provided that plaintiffs would receive the 75,-

1. Defendant B. T. Babbitt, Inc. changed its name to B.T.B. Corporation on December 5, 1969; the name was again changed to International Banknote Company, Inc. on December 29, 1972.

000 shares of BTB stock which had been escrowed pursuant to the 1969 Agreement.[2] The 1971 Agreement itself made no provision for financial consideration to BTB in return. It did, however, contain a release running from all the plaintiffs to all the defendants herein.[3] Paragraph 3 of the 1971 Agreement provides, in relevant part, as follows:

> "3. Except with respect to the rights of Purchasers [plaintiffs] pursuant to Article 7 of the [1969] Agreement [relating to registration and future sale of BTB stock], each of the Purchasers hereby waives each and every claim, demand and right, contingent or otherwise, that he has or may have *by reason of or arising out of or pursuant to the [1969] Agreement or otherwise with respect to (a) any shares of BTB's Common Stock, par value $1.00 per share, and (b) any other thing of value.* Except with respect to the rights of Purchasers pursuant to Article 7 of the Agreement, *each of Purchasers, for himself, his heirs, executors, administrators and assigns hereby totally releases and forever discharges (a) BTB, its subsidiaries, and their respective officers, directors, attorneys and accountants, presently, heretofore and hereafter serving BTB or its subsidiaries and each of their respective heirs, executors, administrators, successors and assigns, . . . of and from all manner of actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, debts, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law or in equity* which such Purchaser ever had, now has or which his heirs, executors, or administrators, hereafter can, shall or may have for, upon or

by reason of any matter, cause or thing whatsoever." (Emphasis added.)

A release negotiated at arm's length and not the product of duress, fraud or mutual mistake, which relates to matured claims of past violations of the federal securities laws but does not excuse future compliance with such laws is to be given its full legal effect. *Murtagh v. University Computing Co.,* 490 F.2d 810, 816 (5th Cir.), *cert. denied,* 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 62 (1974); *Korn v. Franchard Corporation,* 388 F.Supp. 1326, 1333 (S.D.N.Y.1975); *Mittendorf v. J. R. Williston & Beane, Inc.,* 372 F.Supp. 821, 834–35 (S.D.N.Y.1974); *Cohen v. Tenney Corporation,* 318 F.Supp. 280, 284 (S.D.N.Y.1970) (on reargument).

In their answering papers, plaintiffs have not contested the execution or the operative effect of the release. The release is on its face clearly retrospective rather than prospective or anticipatory, and was executed four months after plaintiffs' August 31, 1970 letter charging securities laws violations identical to those asserted in the present suit. Nowhere in the affidavits and memoranda submitted in opposition to defendants' motion is it alleged that plaintiffs failed to comprehend the significance of the release, or that the language of the release does not apply to the claims raised by this action, or that the alleged claims had not matured at the time of the 1971 Agreement, or that plaintiffs entered into the 1971 Agreement without the benefit of counsel. Rather, the sole issue upon which plaintiffs purport to resist the instant motion is their contention that they were under "economic pressure which compelled execution." (Plaintiffs' Memorandum in Opposition at 2).

In order to comprehend the "economic pressure" under which plaintiffs allegedly entered into the 1971 Agreement it is neces-

---

**2.** By means of several integrated agreements, BTB sold Weinschel Company, Inc., the third company acquired from plaintiffs under the 1969 Agreement, together with the Halberstadt Corp., so that it contemporaneously divested itself of its insurance business at the time of the 1971 Agreement with plaintiffs.

**3.** By its terms, the release runs to each of the defendants herein. International Banknote Company, Inc. is the successor to BTB; Edward H. Weitzen is and was at relevant times an officer of International Banknote Company, Inc. and BTB; Barry Hirsch was an officer of BTB; and David Bernstein was an officer of Halberstadt Corp., a BTB subsidiary.

sary to go back to 1969 and to circumstances existing prior to the execution of the 1969 Agreement. At that time, as already mentioned, there was an additional stockholder of plaintiffs' companies who did not wish to participate in the proposed 1969 Agreement, and accordingly it became necessary for plaintiffs to purchase his interest in order to consummate the exchange of the stock of their companies for stock of BTB. In order to obtain funds, plaintiffs herein jointly and severally negotiated a $400,000 loan with the First Jersey National Bank, pledging as collateral the BTB stock to be received under the 1969 Agreement and then valued at $7.50 per share. However, by the autumn of 1970 the value of the stock had fallen to $3.00 per share, and the bank was seriously considering calling the loan. Under the terms of the proposed 1971 Agreement, the balance of BTB's stock transferable to plaintiffs would be released from the escrow provisions of the 1969 Agreement and become available as additional collateral.

According to plaintiffs, after they had exchanged their stock pursuant to the 1969 Agreement, they directed their insurance energies on behalf of Halberstadt Corp. Since the assets of the three plaintiffs' companies, including their goodwill and potential for income, became in effect part of Halberstadt Corp., these companies were themselves of secondary economic significance. Pursuant to its subsequent plan for the overall divestiture of its insurance interests, BTB agreed to sell Halberstadt Corp. and one of the plaintiffs' companies to Integrated Resources ("IR") for $700,000.[4] In addition, plaintiffs agreed to transmit to IR the interest in the other two plaintiffs' companies to be reacquired from BTB under the simultaneously executed 1971 Agreement. In return plaintiffs were to receive $325,000 face amount of IR bonds to be assigned to First Jersey National Bank as additional collateral to forestall the bank's calling the loan. Since the plain-

tiffs' transactions with IR were allegedly contingent upon their execution of the 1971 Agreement, and since their continued involvement in the insurance field was also contingent upon these transactions, plaintiffs allege that they were faced with bankruptcy if they refused to execute the 1971 Agreement which contained the release.

The New York rule [5] concerning economic duress was stated by Chief Judge Fuld of the New York Court of Appeals in *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 324 N.Y.S.2d 22, 272 N.E.2d 533 (1971):

"A contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will." *Id.* at 130, 324 N.Y.S.2d at 25, 272 N.E.2d at 535.

Implicit in this statement of the doctrine is the requirement that the duress be attributable to the party against whom the contract is sought to be voided.

This issue was addressed in the recent case of *Business Incentives Co., Inc. v. Sony Corp. of America*, 397 F.Supp. 63 (S.D.N.Y. 1975), in which the defendant manufacturer moved to dismiss plaintiff's breach of contract claims. The Memorandum and Order of District Judge Knapp which granted the defendant's motion to dismiss with respect to those counts based on economic duress sets forth the following analysis:

"The threat must be wrongful; if the defendant's actions are within his legal rights, plaintiff can not make out a claim of economic duress and the courts will not intervene to void a contract fair on its face. Mere hard bargaining positions, if lawful, and the press of financial circumstances, not caused by the defendant, will not be deemed duress. The alleged duress must be proven to have been the result of defendant's conduct and not of the plaintiff's own necessities. . . .

---

4. *See* note 2 *supra*.

5. Paragraph 8 of the 1971 Agreement provides that it "shall be governed by and construed in

accordance with the internal laws of the State of New York."

In addition to this requirement that the press of circumstances be the result of the defendant's coercive acts, . . . [there are] two other prerequisites to a finding of economic duress: (1) that plaintiff involuntarily accepted the terms offered by defendant and (2) that the circumstances permitted no other alternative." *Id.* at 69. (Citation omitted.)

Defendants argue that any economic duress was imposed by First Jersey National Bank, not by defendants. However, this argument is somewhat simplistic. Plaintiffs allege that certain of the defendants were aware that in order to purchase the share in plaintiffs' companies from the outside stockholder, plaintiffs needed to borrow from the bank and pledge as collateral that portion of BTB's stock which they received free of the escrow agreement under the 1969 Agreement. If the marked decrease in the value of that stock which jeopardized the loan was due to the misrepresentation and omissions of defendants, then one could well argue that plaintiffs' position in 1971 between Scylla and Charybdis was occasioned by the fraudulent acts of defendants. As was pointed out in *Korn v. Franchard Corporation, supra,* 388 F.Supp. at 1333, "it would be manifestly unfair to dismiss a claim on the strength of a release which was obtained as a result of the very fraud complained of . . . ."

 Although releases of the type involved herein are enforceable, "[j]udicial hostility toward waivers generally requires that the right of private suit for alleged violations be scrupulously preserved against unintentional or involuntary relinquishment." *Cohen v. Tenney Corporation, supra,* 318 F.Supp. at 284. Such agreements require a scrupulously careful examination of the facts and circumstances surrounding their execution. *Murtagh v. University Computing Co., supra,* 490 F.2d at 816. Accordingly, there are material issues of fact which are unresolved and which foreclose summary judgment at this stage of the proceedings.

With respect to the motion pursuant to Rule 12(b) dismissing plaintiffs' claim under Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, as time-barred, such claim was withdrawn with prejudice subsequent to the making of the within motions.

Defendants' motion for summary judgment is denied without prejudice to possible later renewal.

So ordered.