NORTHERN OIL COMPANY, INC., Bray Oil Company, Inc., Northern Terminals, Inc., and Dana S. Bray, Plaintiffs-Appellants and Cross-Appellees,

v.

STANDARD OIL COMPANY OF CALIFORNIA and Chevron U.S.A. Inc., Defendants-Appellees and Cross-Appellants.

Nos. 2–41, 2–42, 2–45 and 2–46.

Temporary Emergency Court of Appeals.

Argued Jan. 18, 1985.

Decided March 18, 1985.

Judgment Entered March 26, 1985.

Rehearing and Rehearing En Banc Denied April 24, 1985.

Walter E. Hoffman, J., concurred in part and dissented in part with opinion.

Richard E. Davis, Richard E. Davis Associates, Inc., Barre, Vt., with whom David L. Cleary, Miller, Norton & Cleary, Rutland, Vt., were on brief, for plaintiffs-appellants and cross-appellees.

Jeffrey S. Facter, Cravath, Swaine & Moore, New York City, with whom Allen F. Maulsby, Steven H. Rouhandeh and Robin C. Landis, New York City, of the same firm, were on brief; Douglas C. Pierson and Richard W. Affolter, Pierson, Affolter & Wadhams, Burlington, Vt., of counsel, for defendants-appellees and cross-appellants.

Before HOFFMAN, GIGNOUX and METZNER, Judges.

METZNER, Judge:

This is an action for overcharges, and for consequential and punitive damages, under Section 210(a) and (b) of the Economic Stabilization Act of 1970 ("ESA"), 12 U.S.C. § 1904 note (1980 Supp.), as incorporated in the Emergency Petroleum Allocation Act ("EPAA"), 15 U.S.C. § 751 et seq., for violations of various regulations implementing the EPAA, and for common law fraud, brought in 1978 by plaintiffs-appellants and cross-appellees Northern Oil Company, Inc., Bray Oil Company Inc., Northern Terminals, Inc., and Dana S. Bray, as owner of the three companies (hereinafter collectively referred to as "Bray Oil"), against defendants-appellees and cross-appellants Standard Oil Company of California ("SoCal") and its wholly-owned subsidiary Chevron U.S.A. Inc. ("Chevron"). Both sides appeal from a final judgment entered on April 10, 1984, by Judge Holden in the District of Vermont which awarded plaintiffs $210,000 in damages for overcharges by Chevron on the price of home heating

oil, prejudgment interest, statutory penalties of $210,000 and attorneys' fees and other expenses.[1]

## BACKGROUND

The complex factual background of this case is more than adequately set out in three comprehensive opinions by Judge Holden. For present purposes we outline the facts upon which our decision is predicated.

During the time period relevant to this action, Bray Oil was a major distributor of home heating oil in New York and Vermont. Since 1968 it had purchased its product from Chevron pursuant to a contract effective by its terms until May 31, 1973. Under the terms of that contract, Bray Oil purchased product at prices posted by Chevron at Albany, New York, and Burlington, Vermont, minus certain discounts. Well before that contract was due to expire the parties began negotiations for a new contract. Chevron demanded, among other things, pricing terms more favorable to it because its profits under the old contract had steeply declined.

In early May of 1973 Chevron made several deliveries which Bray Oil accepted and later paid for at a higher price than provided for in the written contract in effect at the time of the deliveries. In July of 1973, after hard bargaining between the parties, Chevron convinced plaintiffs to enter into a new contract with pricing terms F.O.B. New York Harbor. This new contract also provided that it would be effective "as of May 1, 1973." Chevron informed Bray Oil that it desired the backdating in order to have all its customers signatory to contracts with that uniform date. The jury found at trial that this representation was false or misleading, and that Bray Oil relied on the representation in agreeing to the backdating of the contract.

On July 19, 1973, after many but not all of the documents comprising the new contract had been signed, the Cost of Living Council ("COLC") proposed for notice and comment a regulation fixing May 15, 1973, as the freeze date for Phase IV of the federal energy regulatory program. The last of the documents comprising the "as of May 1, 1973" contract were signed on August 13, 1973. On August 19, 1973, the freeze date of May 15, 1973, was adopted. 38 Fed.Reg. 22536, 22541 (August 22, 1973).

Once the price regulations were promulgated, Chevron placed Bray Oil in a "class of purchaser" (10 C.F.R. § 212.31) reflecting the new backdated contract terms rather than those of the old contract which had been in effect on May 15, 1973. Because of this, Chevron was able to and did charge Bray Oil a higher price under the regulations than would have been lawful if Bray Oil had been classified pursuant to the price terms of the old contract.

In the summer of 1973 Bray Oil transferred nearly seven million gallons of heating oil to one of its customers, Green Mountain Petroleum Company, and received more than one million dollars in payment without reporting the transaction to Chevron (the "Green Mountain transaction"). This violated the consignment terms of Bray Oil's contract with Chevron. Chevron learned of the Green Mountain transaction by chance six months later. As a result of this transaction, Chevron insisted on new credit terms when the parties negotiated a new agreement for 1974–75. The 1974–75 contract established a fixed schedule of payments based on the 1972 pattern of withdrawals.

Subsequently, one of Bray Oil's customers filed a complaint with the Federal Energy Administration ("FEA") concerning the change in credit terms. On October 24, 1974, the FEA issued a Notice of Probable Violation ("NOPV") to Chevron and com-

---

**1.** Chevron filed a counterclaim to collect the unpaid balance on a promissory note from plaintiffs. An earlier state court suit on this issue was stayed pending the outcome of the federal litigation. Judge Holden granted judg-

ment on that counterclaim for an aggregate amount in excess of $3.2 million. Plaintiffs have not challenged that judgment on this appeal.

menced an investigation. As a result, in November of 1974, Bray Oil unilaterally ceased paying Chevron in accordance with the fixed payment schedule of the 1974–75 contract and instead returned to the previous consignment arrangement. Chevron did not challenge Bray Oil's action because of the FEA's ongoing investigation regarding the NOPV. Because the winter of 1974–75 was mild, the payments for withdrawals were less than what would have been called for by the fixed payment schedule.

The parties failed to resolve their differences before the expiration of the 1974–75 supply contract on May 1, 1975. On July 24, 1975, the FEA notified Chevron that it was rescinding the NOPV in order to broaden the investigation to include the retroactive effect of the "as of May 1, 1973" contract, but that it would be unable to proceed with the investigation until it had greater manpower. In a letter dated August 28, 1975, Chevron informed Bray Oil of the rescission, but not the reason for it.

At that time both parties were under pressure to reach an agreement. With the rescission of the NOPV, Chevron had put Bray Oil on a "cash first" delivery basis, which precluded Bray Oil from being able to purchase its full needs for the winter. In addition, the transportation of product would become increasingly difficult as the weather worsened. For its part, Chevron feared adverse publicity if a shortage of home heating oil developed. After mediation by FEA and state officials, the parties on October 14, 1975, reached agreement on the 1975–76 supply contract. In conjunction with that agreement, Chevron agreed to an interest-free promissory note on the substantial debt owed it by Bray Oil. Bray Oil in turn signed a general release which purported to release Chevron from any claims, including those under the EPAA, Bray Oil may have had stemming from the relationship between the parties under the "as of May 1, 1973" contract.[2]

Following the expiration of the 1975–76 contract, Mr. Bray sold or leased his various properties and retired to Florida, leaving behind a substantial balance on the promissory note as well as other obligations to Chevron.

The instant suit was commenced in 1978 and resulted in a bifurcated trial. In the liability phase, which lasted seven months, the jury returned eleven special verdicts with a total of 52 subparts. The jury

2. The release provides as follows:

"IT IS AGREED by and between Chevron and Bray that Chevron hereby releases Bray and Bray hereby releases Chevron and each of them hereby releases each of their respective parent corporations, if any, affiliates, successors and assigns, servants, agents and employees, from and against any and all loss, cost, claims, damages, liabilities, actions, and causes of action which each may have or which each may allege to have had against the other arising out of actions, agreements, contracts, commitments, relationships or action taken or omitted to be taken up to the date hereof based on tort, contract, negligence, anti-trust or violation of State or Federal Regulations excluding, however, the following:

A) Payments under Agreements existing immediately prior to the execution hereof with respect to the sale of products referred to therein, payment for which is not to be made prior to the effective date hereof and which have not otherwise been resolved as between Chevron and Bray,

B) Obligations undertaken by Bray and its affiliates, or any one or more of them, with respect to financing loans, through banks, the re-payment of which loans Chevron has guaranteed at the request of Bray and its affiliates, or any one of them, and

C) Obligations undertaken by Chevron and/or Bray arising out of Agreements executed on or after this date in the resolution of past differences.

Bray, by its execution hereof, acknowledges the validity of certain arrangements entered into between it and Chevron dated as of May 1, 1973 and as of May 1, 1974 relating to the purchase and sale of petroleum products.

Bray further acknowledges that it shall file no claim, complaint or charge for its own intended benefit, or that of others, nor be entitled to retain the benefit of the disposition of a claim, complaint or charge filed by any other party with the Federal Energy Administration involving Chevron's allocation and pricing practices towards Bray under Acts or Regulations relative to Federal Price Control and Allocation Regulations presently within the jurisdiction of the Federal Energy Administration."

found, among other things, that at the time Chevron was negotiating a new contract with plaintiffs in 1973, it represented to Mr. Bray that the reason for selecting the "as of May 1, 1973" starting date was to place all distributors of middle distillates on a uniform contract year. The jury found that this representation was false or misleading, that Mr. Bray relied on the representation, and that plaintiffs suffered financial harm as a result of signing the 1973–74 contract. The jury found as well that Bray Oil had no knowledge at the time regarding the COLC consideration of the proposed freeze date.

Relying on the jury's findings, the district court held that Chevron's misrepresentation of its reason for seeking the backdating term amounted to fraud which invalidated the entire contract. The court therefore classified plaintiffs according to the terms of the old contract, and determined that Chevron had overcharged plaintiffs under 10 C.F.R. § 212.82 and Section 210(b) of the ESA. The court concluded, however, that the release executed by Bray Oil in 1975 barred recovery for overcharges made prior to its execution.

## DISCUSSION

Numerous issues have been raised on this appeal by both sides. The most important one involves the validity and effect of the mutual general release executed on October 14, 1975. Bray Oil asserts on appeal that the district court erred in setting aside special verdicts in which the jury found that Chevron had fraudulently induced Bray Oil to execute the release. Chevron contends in its cross-appeal that the district court erred in holding that the release does not bar the claim for overcharge damages based upon deliveries made after October 14, 1975.

### I. The Release

#### A. Jurisdiction

■ We turn first to the question of this court's jurisdiction to determine the issue of the validity and effect of the release. It is clear that this court has jurisdiction over

an issue when "resolution of the litigation in its entirety requires the application or interpretation of the EPAA and regulations, and [when] an EPAA issue has been adjudicated in the district court." *Mobil Oil Corp. v. Department of Energy*, 728 F.2d 1477, 1497 (Temp.Emer.Ct.App.1983) (citations omitted). *See also Mountain Fuel Supply Co. v. Johnson*, 586 F.2d 1375, 1381 (10th Cir.1978) (case arises under the EPAA if it "clearly and substantially involves a dispute or controversy respecting the validity, construction or effect of such laws which is determinative of the resulting judgment"), *cert. denied*, 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1058 (1979). *Accord Scallop Corp. v. Tully*, 705 F.2d 645, 647 (2d Cir.1983). Our jurisdiction has been construed as "issue jurisdiction." *Coastal States Marketing, Inc. v. New England Petroleum Corp.*, 604 F.2d 179 (2d Cir.1979); *Texaco, Inc. v. Department of Energy*, 616 F.2d 1193 (Temp. Emer.Ct.App.1979). As the court noted in *Texaco*, "jurisdiction is not an either-or proposition with regard to the case as a whole. Rather the Court takes jurisdiction over those issues which it has authority to decide, refusing to hear any others, although they are all part of the same case or controversy." *Id.* at 1197.

As a general rule, this court has declined jurisdiction and permitted a bifurcated appeal only where the issues over which it declines jurisdiction provide an independent substantive ground for relief, or will not facilitate the decision of an EPAA claim. *See Atlantic Richfield Co. v. Department of Energy*, 655 F.2d 227, 233 (Temp.Emer. Ct.App.1981) (purely private contract claims); *Longview Refining Co. v. Shore*, 554 F.2d 1006, 1009 n. 5 (Temp.Emer.Ct. App.) (antitrust and contract claims), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *Spinetti v. Atlantic Richfield Co.*, 522 F.2d 1401, 1403 (Temp. Emer.Ct.App.1975) (antitrust, fair trade and fraud claims).

■ In *Newman Oil Co. v. Atlantic Richfield Co.*, 597 F.2d 275 (Temp.Emer.Ct.

App.), *cert. denied,* 444 U.S. 842, 100 S.Ct. 83, 62 L.Ed.2d 55 (1979), we held that this court had jurisdiction over a cause of action arising from a fraudulent representation intended to induce a party to forgo EPAA rights. 597 F.2d at 279. The release issue in this case is under appeal precisely because Bray Oil contends that Chevron made a false representation to it which induced it to sign a release forgoing any EPAA rights it might have had. *Newman Oil* therefore controls this case. *See also Rainey v. Union Oil Co. of California,* 732 F.2d 1563, 1564, n. 1 (Temp.Emer.Ct. App.1984) (breach of contract and tortious interference with contract claims adjudicated because of interdependency with EPAA claims); *Mobil Oil Corp. v. Department of Energy,* 728 F.2d at 1497 (exercising jurisdiction to decide issue of contract interpretation because "incident to and interwoven with," overcharge claim); *Francis Oil and Gas, Inc. v. Exxon Corp.,* 687 F.2d 484, 487 (Temp.Emer.Ct.App.) (breach of contract claim that alleges entitlement to a specific price based upon the federal price regulations clearly falls within TECA jurisdiction), *cert. denied,* 459 U.S. 1010, 103 S.Ct. 365, 74 L.Ed.2d 400 (1982).

### B. *Validity of the Release*

In a long and carefully reasoned discussion of the evidence and the applicable law, the district court set aside those special verdicts of the jury which indicated that the release of EPAA rights given by plaintiffs in conjunction with the signing of the 1975–76 contract had been induced by fraud on the part of Chevron. The district court concluded that the release was obtained as the result of hard bargaining between two sophisticated commercial entities, and that plaintiffs had not in fact relied on any misrepresentation Chevron may have made regarding FEA action concerning the relationship between the parties. The court also held that under federal law applicable to the release plaintiffs had no right to rely blindly on any misrepresentation Chevron may have made because plaintiffs had adequate access to information regarding the rescission of the NOPV. Plaintiffs raise four objections to the district court's holding. After careful consideration, we hold that none has merit and affirm the district court's ruling that as a matter of law the release was valid.

Plaintiffs first argue that the district court erred because in setting aside the special verdicts it necessarily passed upon the credibility of witnesses and so usurped the jury's function. The evidence must be viewed in the light most favorable to the plaintiffs here. *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970). The standard for reviewing the district court's action is whether "the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict ...." *Brady v. Southern Railway Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234–35, 88 L.Ed. 239 (1943).

Our review of the evidence discloses that on July 24, 1975, the FEA informed Chevron by letter that it was rescinding the NOPV it had issued the year before, but would, when it had available manpower, broaden the scope of the investigation to include possible violations stemming from the backdating of the "as of May 1, 1973" contract. Chevron later informed Bray Oil of the rescission in a letter dated August 28, 1975, but did not state the reason for or the effect of the rescission.

The claim of fraudulent inducement is in essence based upon the allegation by Mr. Bray that a few days after receipt of that letter he received a telephone call from a Chevron employee stating that the FEA had found Chevron innocent of any wrongdoing in the handling of the Bray Oil account. Bray Oil asserts that this false statement caused it to believe that it no longer had EPAA rights against Chevron, and induced it to sign the release.

As noted above, Bray is a sophisticated businessman represented by counsel. A telephone call or letter to the FEA would have revealed the true facts. Neither was availed of by Bray. Moreover, Bray and his attorney were often in contact with FEA officials, including a lengthy meeting

on September 17, 1975, but never asked about the rescission of the NOPV. Finally, Bray admits that after these representations were made, he was advised by his attorney, in a letter dated September 9, 1975, to proceed with a complaint before the FEA.

Although Judge Holden charged the jury under Vermont law on this issue, he later correctly determined that federal law governed the validity and effect of the release. *See Locafrance U.S. Corp. v. Intermodal Systems Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir.1977) (federal law governs all questions relating to purported releases of federal statutory causes of action). *See also Dice v. Akron, Canton & Youngstown Railroad Corp.*, 342 U.S. 359, 361, 72 S.Ct. 312, 314, 96 L.Ed. 398 (1952). We find that the district court was clearly correct in ruling that as a matter of federal law plaintiffs were under a duty to investigate the true status of the FEA action and were not entitled to rely on the representations of their adversary in the midst of negotiations when they had several opportunities to make such inquiry of the FEA itself.

This court has specifically held that in forgoing the assertion of rights under the EPAA, a buyer cannot blindly rely on a false statement by a seller as to action taken by an enforcement agency when the buyer has access to that agency. *Western Mountain Oil, Inc. v. Gulf Oil Corp.*, 726 F.2d 765 (Temp.Emer.Ct.App.1983). In *Western Mountain*, the court rejected a fraud claim similar to the one here asserted by Bray Oil. Plaintiff in that case asserted that the statute of limitations had been tolled by defendant's false representation

that the FEA had approved its pricing structure.

This court held, however, that though the statement may have been false, it did not constitute fraudulent concealment because plaintiff had a duty to investigate:

"While Gulf may have wrongfully asserted the propriety of its pricing method, we do not find that appellant was entitled to blindly rely on that assertion without making any further investigation. Nor do we find the existence of any fiduciary relationship between the parties which might excuse the duty of further investigation."

726 F.2d at 768.

*Western Mountain* makes clear that Bray Oil had no right to rely blindly on any false statement by Chevron made during negotiations when Bray Oil clearly had access to the true facts regarding the rescission of the NOPV.[3] *See also Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729, 737–38 (2d Cir.1984) (recognizing principle of federal and New York common law that misrepresentation made during business negotiations not actionable if adversary had access to information); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123–24 (2d Cir.1984) (concealment of material fact during negotiations surrounding a business transaction not actionable fraud if adversary had access to, but did not pursue investigation of, true fact); *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 282 (2d Cir.1975) ("if the plaintiff has been furnished with the means of knowledge and he is not prevented from using them he cannot say

---

**3.** The fact that in *Western Mountain* the fraud claim was asserted to avoid the operation of the statute of limitations does not diminish its application here. Indeed, its rule applies with even greater force to an effort to avoid a release. While for policy reasons courts have tended to disfavor strict enforcement of statutes of limitations, they have generally favored strict enforcement of releases granted in a commercial context for valuable consideration and with advice of counsel. *Compare Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 314–16, 65 S.Ct. 1137, 1142–43, 89 L.Ed. 1628 (reflecting willingness to

permit impact of statutes of limitation to be restricted), *reh'g denied*, 325 U.S. 896, 65 S.Ct. 1561, 89 L.Ed. 2006 (1945) *with Locafrance U.S. Corp. v. Intermodal Systems Leasing, Inc.*, 558 F.2d at 1115 (encouraging enforcement of releases made in commercial context where language of release is clear), *and Ruskay v. Waddell*, 552 F.2d 392, 398 (2d Cir.) ("strong policy considerations require that what all parties thought to be a closed matter [by virtue of a general release] should remain so."), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977).

that he has been deceived by the misrepresentations of the other party.").

The regulations cited by plaintiffs, 10 C.F.R. § 202.9 and § 205.201(e), clearly do not prohibit the release by the FEA of the fact and effect of the rescission of a NOPV. Such regulations were designed solely to protect the confidentiality of business information supplied by parties to the NOPV and the integrity of the internal processes of the agency itself.

■ Plaintiffs next argue that as a matter of law the release is contrary to public policy. We have made it quite clear, however, that the EPAA embodies a policy favoring private settlement of disputes under the statute. *See Longview Refining Co. v. Shore,* 554 F.2d at 1012. There is no public policy which prohibits an otherwise valid release from operating to bar federal statutory causes of action. *See Mittendorf v. J.R. Williston & Beane, Inc.,* 372 F.Supp. 821, 835 (S.D.N.Y.1974).

Plaintiffs also argue that the release is void as a matter of public policy because it is an involuntary relinquishment of federal rights. It is abundantly clear, however, that "involuntary relinquishment" is not an independent ground for setting aside a release, but merely a shorthand reference to the traditional grounds for rescission— which the district court held inapplicable both because plaintiffs knew they were releasing claims that they might have under the EPAA against Chevron and because they were not entitled as a matter of law to rely on statements made by adversaries under such circumstances. This contention therefore adds nothing to the plaintiffs' case.

Finally, plaintiffs contend that the release is void because it is part of an integral scheme to violate federal law and to perpetuate that violation. They rely on *Ingram Corp. v. J. Ray McDermott, Inc.,* 698 F.2d 1295 (5th Cir.1983), an antitrust conspiracy case which discussed the possible application of such a standard to a future case whose facts merited it. Even were we to assume that this language provided another means in addition to a fraud-

ulent inducement claim to attack the validity of a release, which we do not, plaintiffs have not shown on the facts of this case that the release is part of any such scheme. As the court noted in *Ingram,* if the release is merely an outgrowth, rather than a cause, of the violation, it cannot be part of any such scheme. 698 F.2d at 1315.

## C. *Scope of the Release—Statutory Claims*

■ In construing the scope of the release, we must give effect to the intent of the parties, as demonstrated by the language of the release itself and the circumstances surrounding its execution. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 342–48, 91 S.Ct. 795, 808–11, 28 L.Ed.2d 77 (1971). We agree with the district court that by the plain language of the release, the parties settled all claims under previously existing contracts in the context of the applicable federal law and regulatory scheme.

The district court went on to hold, however, that the release did not bar claims for damages in the contract year following its execution because the cause of action for these damages accrued after the release had been executed. The court stated that the "release executed by Bray barred matured claims then accrued; it did not bar claims that might arise from future violations of federal law." In a later decision confirming its prior ruling, the district court held that prospective application of the release would offend public policy and undermine the policy of the price freeze regulations to maintain the supplier-purchaser relationship as it was in 1972–73.

This court has consistently held, however, that a cause of action for an overcharge based on an improper classification accrues at the time of the original improper classification. *Western Mountain Oil, Inc. v. Gulf Oil Corp.,* 726 F.2d at 767; *Fleetwing Corp. v. Mobil Oil Corp.,* 726 F.2d 768, 770 (Temp.Emer.Ct.App.1983); *Lerner v. Atlantic Richfield Co.,* 731 F.2d 898, 900–01 (Temp.Emer.Ct.App.1984). In

these cases this court has clearly rejected the "continuing violation" theory in the context of actions for overcharges based on an improper classification. *See also Siegel Oil Co. v. Gulf Oil Corp.*, 701 F.2d 149, 153 (Temp.Emer.Ct.App.1983) (continuing violation concept rejected as to claim under substitute supplier rule). The fact that the instant case involves a release, while the cases referred to involve the application of the statute of limitations, is a distinction without a difference in this case. We find no legitimate policy reason for allowing a party to escape the effects of an otherwise valid release more easily than he could a statute of limitations. The cause of action for all damages arising from the improper classification, therefore, accrued prior to the execution of the release.

The general proposition that public policy precludes the application of a release to bar claims that arise from future violations of federal law is therefore not an issue here. *See Fox Midwest Theatres, Inc. v. Means*, 221 F.2d 173, 180 (8th Cir.1955); *Pearlstein v. Scudder & German*, 429 F.2d 1136, 1143 (2d Cir.1970), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971); *Weinraub v. International Banknote Co., Inc.*, 422 F.Supp. 856, 858 (S.D.N.Y.1976). This case does not invoke the policy concerns inherent in the situation where a release purports to allow a knowingly guilty party to violate federal law in the future. Since the cause of action for any overcharges during the contract year 1975–76 arose at the time of misclassification in 1973, there is no future violation present here. There are only future damages arising from a past violation.

█ It is clear that parties may agree to release claims of future damages arising from past violations of federal law where the cause of action for the past violation had accrued at the time the release was executed. *See United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 853–54 (5th Cir.1975) (release bars all Title VII claims for damages incurred because of continuing effects of past violations), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48

L.Ed.2d 187 (1976); *Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc.*, 338 F.Supp. 1019, 1022 (S.D.Tex.1972) (release bars damages from pre-release activity not consummated until after release executed). *See also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. at 348, 91 S.Ct. at 811 (parties may validly release future damages).

Judge Holden held that the *Western Mountain* rule as to the accrual date of overcharge claims was inapplicable to this case because of certain exclusionary language in the release:

"While the argument has some surface appeal, it ignores the particular language of the 1975 release agreement which carves out three exceptions from its operation and effect. One of these exclusions is

[C] Obligations undertaken by Chevron and/or Bray arising out of Agreements executed on or after this date in the resolution of past differences.

It seems clear enough to the court that overcharges resulting from a misclassification grounded in fraud which was carried forward to the supply agreement 'executed on or after' October 14, 1975, were not extinguished.

While the release purported to compromise any claims of fraud that attended the prior arrangements 'as of May 1, 1973 and as of May 1, 1974,' it specifically excluded the contract relating to sale and purchase of petroleum products executed on or after the date of the settlement."

From the face of the release and the evidence in the record, however, it is quite clear that this exclusionary language applied only to a promissory note executed that day to resolve past differences between the parties concerning certain debts. Other exclusionary language regarding payments under already existing agreements is equally inapplicable. Both parties understood that the release was drafted to preclude any challenges to the pricing and

credit terms of the "as of May 1, 1973" and May 1, 1974 contracts.[4]

The district court therefore erred in holding that the release does not bar claims for overcharge damages in the contract year following its execution.[5]

### D. *Scope of the Release—Common Law Claims*

The district court held that plaintiffs' exclusive remedy in this action was damages for overcharges under Section 210(b) of the ESA. Plaintiffs claim that they have suffered other legal wrongs separate from the overcharges which should be compensable under Section 210(a) of the ESA. These wrongs, plaintiffs claim, stem from common law fraud and the consequential loss caused because the overcharges placed them in a noncompetitive market position ultimately causing the sale of the businesses below fair market value.

Our holding as to the validity of the release makes it unnecessary for us to consider the correctness of the district court's ruling that plaintiffs' damages were limited to those provided under Section 210(b). The release effectively bars recovery for any damages stemming from common law fraud based on the negotiation of the "as of May 1, 1973" contract.

## II. *The Change in Credit Terms in the 1974–75 Contract*

Bray Oil also claims that the district court erred in finding that a change in credit terms in the 1974–75 contract from a consignment arrangement to a fixed payment schedule did not violate 10 C.F.R. § 210.62(a). Our holding as to the validity of the release, however, makes it clear that Bray Oil would be barred from recovering any damages realized prior to the date of the release arising from the change in cred-

it terms. For the same reasons noted above regarding overcharge claims based upon an improper classification, we hold that the release has prospective effect to bar recovery for any damages stemming from the change in credit terms in the 1974–75 contract. *See Shell Oil Co. v. Nelson Oil Co.,* 627 F.2d 228, 236 (Temp. Emer.Ct.App.) (cause of action for change in credit terms accrues when acts constituting challenged change occurred), *cert. denied,* 449 U.S. 1022, 101 S.Ct. 590, 66 L.Ed.2d 484 (1980).

In view of our holding that plaintiffs released their claim for overcharge damages realized in each of the three contract years in question, we vacate the district court's award of prejudgment interest, penalty damages, attorneys' fees and other expenses.

The judgment below is affirmed in part and reversed in part and the matter remanded to the district court for entry of final judgment in favor of the defendants.

HOFFMAN, Judge, concurring in part and dissenting in part.

While I agree with the majority as to the principal points discussed in the opinion, I do not agree with the discussion in part I–C relating to the Scope of the Release. The Release is quoted verbatim in footnote 2 of the opinion and will not be repeated in detail.

The Release, executed on October 14, 1975, mutually releases any "causes of action which each *may have* or which each may allege to *have had* against the other arising out of actions, agreements, contracts, commitments, relationships or action taken or omitted to be taken *up to the date hereof* based on tort, contract, negligence, antitrust or violation of State or

---

**4.** Indeed, as Bray Oil's attorney testified, he and his client were aware prior to the signing of the release that "once [the validity of the 1973–74 contract] was resolved, well, then that resolution would extend throughout the time that this particular commodity, petroleum, was regulated." (Tr. 7672; Def.App. No. 2–42 at 168).

**5.** We need not address plaintiffs' claim that the negotiation and execution of the "as of May 1, 1973" contract violated various other EPAA regulations. The release bars recovery for any damages stemming from the alleged violation of all EPAA regulations.

Federal Regulations excluding, however, the following:

[C] Obligations undertaken by Chevron and/or Bray arising out of Agreements executed on or after this date in the resolution of *past* differences."

The Release continues:

Bray, by its execution hereof, acknowledges the validity of certain arrangements entered into between it and Chevron dated as of May 1, 1973 and as of May 1, 1974 relating to the purchase and sale of petroleum products.

This Release does not refer to future violations by Chevron, concerning which the majority opinion has held are barred by the release. While it is true that the Release acknowledges that the 1973 and 1974 arrangements were valid, both the district court and the majority opinion have held to the contrary.

In my opinion, the district court correctly construed the Release, and its judgment should be affirmed in every respect. To hold, as does the majority, that a continued violation by Chevron after October 14, 1975, is permissible and bars the victim from a right of action, would, in my view, *be contrary to public policy.*

The majority relies upon *Western Mountain Oil, Inc. v. Gulf Oil Corp.,* 726 F.2d 765 (Temp.Emer.Ct.App.1983), for the proposition that the cause of action accrues at the time of the original improper classification. *Western Mountain,* however, is clearly distinguishable from the case at bar. In *Western Mountain,* the plaintiff brought suit on a claim of having been overcharged. The court ruled that the claim was barred by the statute of limitations. There was only one three-year contract involved [1] and the plaintiff brought suit after the contract expired. The plaintiff in that case had argued that each delivery of petroleum constituted a violation. The *Western Mountain* court held that the

cause of action accrued when the overcharging commenced at the beginning of the contract.

The policy underlying the statute of limitations supports the conclusion in *Western Mountain.* If it is deemed to be a separate violation each time any petroleum is delivered, then a company would be forced to re-examine its classification of each purchaser each time there is a delivery. This would be an onerous burden to impose upon the companies. It is at the time of contracting that the supplier classifies the purchaser.

In the case *sub judice* there were three separate contracts. The contract term which placed Bray in the wrong class of purchasers first appeared in the 1973–74 contract. This term was repeated in the two subsequent contracts. We are only concerned with the last contract covering the year 1975–76. The release was signed on October 14, 1975 at the same time the 1975–76 contract was signed. The cause of action for overcharges in the 1975–76 contract year accrued at the beginning of the contract. In that contract Chevron improperly classified Bray which resulted in Bray being overcharged during the term of the contract. It was at the time of contracting that the price terms were established which would be in effect for 1975–76. Chevron was obligated not to charge a price which exceeded the maximum lawful price under the regulations. The previous contracts had no legal force beyond their expiration. The fact that Chevron had committed the same type of violation in those previous contracts is irrelevant. At the time the 1975–76 contract was agreed upon, Chevron's negotiators specifically considered the price terms of the 1975–76 contract. This is unlike the purely ministerial task of shipping quantities of petroleum according to the terms of the contract found in *Western Mountain.*

---

**1.** The other cases cited by the majority, *Fleetwing Corp. v. Mobil Oil Corp.,* 726 F.2d 768 (Temp.Emer.Ct.App.1983), and *Lerner v. Atlantic Richfield Co.,* 731 F.2d 898 (Temp.Emer.Ct. App.1984), do not state whether there was more than one contract involved. Furthermore, they merely rely upon *Western Mountain* on this issue.

A release of future violations is, without question, void against public policy. *Pearlstein v. Scudder & German,* 429 F.2d 1136 (2d Cir.1970), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971); *Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.,* 568 F.Supp. 1096 (N.D.Ill. 1983); *Weinraub v. International Banknote Company, Inc.,* 422 F.Supp. 856 (S.D.N.Y.1976); *Korn v. Franchard Corp.,* 388 F.Supp. 1326 (S.D.N.Y.1975). If the release is held to bar Bray's claims for the 1975–76 contract years, it would allow companies to absolve themselves of all future violations by having the purchaser sign a release of a similar past violation. For this reason, I would affirm Judge Holden's decision.