VKK CORPORATION, VKK Patriots, Inc., Victor K. Kiam II, Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE, B & B Holdings, Inc., The Five Smiths, Inc.; Buffalo Bills, Inc., The Chicago Bears Football Bears Club, Inc., Cincinnati Bengals, Inc., Cleveland Browns Football Co., Dallas Cowboys Football, Inc., PDB Sports Inc., The Detroit Lions, Inc., The Green Bay Packers, Inc., Houston Oilers, Inc., Indianapolis Colts, Inc., Kansas City Chiefs Football Club, Inc., Miami Dolphins, Ltd., Minnesota Vikings Football Club, Inc., New York Football Giants, Inc., New York Jets Football Club, Inc., Pittsburgh Steelers Sports, Inc., San Diego Chargers Football Co., Seattle Seahawks, Inc., Tampa Bay Area NFL Football, Inc., Pro–Football, Inc., Touchdown Jacksonville, Ltd., and Touchdown Jacksonville, Inc., Defendants.

No. 94 Civ. 8335(MP).

United States District Court, S.D. New York.

June 22, 1999.

As Amended July 8, 1999.

NFL and the defendant member clubs shall be referred to collectively as the "NFL."

Williams and Connolly (Steven R. Kuney, Mark S. Levinstein, Kevin Downey, of counsel), Washington, D.C., Kramer Levin Naftalis, Nessen Kamin & Frankel, LLP (Robert M. Heller, of counsel), New York City, for plaintiffs VKK Corporation, VKK Patriots, Inc., Victor K. Kiam, II.

Skadden, Arps, Slate, Meagher & Flom, LLP (Shepard Goldfein of counsel), New York City, Covington & Burling (Gregg H. Levy of counsel), Washington, DC, for National Football League and Member Team, defendants.

Foley & Lardner (Steven Werber, Chanley Howell of counsel), Jacksonville, FL, co-council for Jacksonville Jaguars, Ltd.

Bledsoe, Schmidt, Lippes & Moonly, P.A. (Terrance E. Schmidt of counsel), Jacksonville, FL, Cooperman, Levitt, Winikoff, Lester & Newman, P.C. (Allen G. Reiter of counsel), New York City, for Touchdown Jacksonville, Inc.

## DECISION

MILTON POLLACK, Senior District Judge.

### Preliminary

The plaintiffs in this case are Victor K. Kiam II, VKK Corporation and VKK Patriots, Inc. The plaintiffs owned a controlling interest in the New England Patriots, a football team located in Foxboro, Massachusetts, from October 1988 until May 1992.

The defendants in this case are certain member clubs of the National Football League including Jacksonville Jaguars, Ltd.,[1] and a non-member entity, viz., Touchdown Jacksonville Inc. ("TDJ Inc.") which was added by amendment of the complaint filed and served in 1998. The

On May 8, 1992, Kiam executed and delivered to the NFL a broad General Release of any claims plaintiffs might have against the NFL. This General Release specifically provided that plaintiffs released the NFL from any and all antitrust claims.

More than thirty months after he signed the general release, Kiam filed the instant lawsuit, in which the original complaint alleges that the NFL defendants including the defendant Jacksonville Jaguars, Ltd. illegally conspired to block plaintiffs from relocating the Patriots to an area outside New England.

The instant suit was predicated on the claim that the Release was invalid as having been obtained while Kiam was under economic duress caused by the NFL. Extensive discovery was undertaken involving over thirty witnesses examined commencing on dates in 1995 and continuing from dates in 1998 and 1999 until as late as May 24, 1999. A motion by defendants for summary judgment was denied. The issue on the Release was then severed for a separate preliminary jury trial.

After a full trial, a jury rejected Kiam's economic duress claim. The jury found that the plaintiffs were not under economic duress caused by the NFL and its member clubs when plaintiffs executed and delivered the General Release. On April 16, 1999, this Court directed entry of a final judgment against the plaintiffs on the economic duress claim.

After entry of judgment on the duress claim, Kiam pressed forward on a theory that the Release was "part and parcel" of a conspiracy and was invalid for that reason, and that he had received no consideration for the Release. The defendants respond-

---

1. About one year prior to the filing of the original complaint the name of defendant "Touchdown Jacksonville, Ltd." (a limited partnership), had been changed to "Jacksonville Jaguars, Ltd." In both their original complaint and their amended complaint, the plaintiffs nonetheless referred to Jacksonville Jaguars, Ltd. as Touchdown Jacksonville, Ltd.

ed with a renewal of their motion for summary judgment delineating separate issues.

After identifying and briefing of those motions and affording plaintiffs a final opportunity for further depositions of persons not theretofore deposed, the Court scheduled a hearing,[2] pursuant to Federal Rule of Civil Procedure 43(e), "to assay the alleged probative evidence of the plaintiffs ..., to narrow the [remaining] controverted issues[, if any,] to triable matters and to dispose of matters unsupported by admissible evidence." *Argus Inc. v. Eastman Kodak Co.*, 612 F.Supp. 904, 908 (S.D.N.Y. 1985), *aff'd*, 801 F.2d 38 (2d Cir.1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). Plaintiffs' counsel were informed in advance of the hearing that they would be expected to call live witnesses and to offer specific admissible evidence in support of their position that they were entitled to a trial on the remaining issues assertedly raised by plaintiffs' claims. The Court set aside two days for the evidentiary hearing.[3]

On May 27, 1999, the first day set aside for the hearing, plaintiffs' counsel appeared but offered no live witnesses. They did not call to the stand any witness who allegedly had knowledge and specific admissible testimony regarding the issues that plaintiffs claimed to be in dispute. They did not call Kiam; they did not call any NFL or club executives who were within subpoena range; they did not call any third party witnesses to whom they had previously attributed knowledge of the alleged conspiracy or of plaintiffs' alleged

injury; nor did plaintiffs call their alleged economic expert, who had submitted an affidavit purporting to support one of their opposition papers. Instead, plaintiffs' counsel merely identified prior deposition and testimonial excerpts and made a brief argumentative statement on the legal issues and asserted a request which the Court deemed dilatory for new discovery pursuant to Rule 56(f).

Despite the opportunity afforded by the extensive discovery previously undertaken in this case over years, and the full jury trial on the duress issue, the plaintiffs failed to provide specific admissible facts to show that there is a genuine issue remaining for trial.

The Court finds that the plaintiffs' reference to excerpts of prior inconclusive deposition testimony has failed to set forth the required specific probative facts showing that there is a genuine issue for trial, and the plaintiffs' failure to produce witnesses with specific probative evidence at the Rule 43(e) proceeding as well as the informative state of the record in the jury trial on the Release, preclude the claims asserted herein. Accordingly, the NFL motions for summary judgment based on the scope of the Release and on the part and parcel theory and on all the plaintiffs' claims asserted in the first amended complaint as well as the motion based on the statute of limitations addressed to the new party added to the case in 1998 will be granted. Costs to the NFL to be separately determined and entered at the foot of the judgment hereon. The counterclaims are reserved herefrom.

---

**2.** At the post-trial conference, the Court granted plaintiffs' request for thirty days to conduct additional discovery. Tr., Apr. 22, 1999 Conference, at 28 ("*Why not give us thirty days to take depositions and submit our set of papers*"); *id.* at 29–30 ("three or four weeks is not an unreasonable amount of time") (both comments by plaintiffs' counsel). Two weeks later, plaintiffs' counsel wrote to the Court seeking leave to conduct 26 additional deposition and an indefinite postponement of the hearing, both of which were patently unreasonable and vexatious demands.

**3.** The hearing was not intended to address defendants' breach of contract counterclaim for damages or defendants' request for sanctions under 28 U.S.C. § 1927. *See* NFL Defendants' Motion (1) For summary Judgment On Their Counterclaim And (2) To Amend The Final Judgment For The Purpose of Imposing Sanctions Under 28 U.S.C. § 1927, dated May 3, 1999.

## EVIDENCE AS TO WHICH THERE IS NO GENUINE MATERIAL ISSUE TO BE TRIED

### Kiam's Business Experience and Advisers

1. Kiam was an experienced businessman who was advised throughout the relevant period by sophisticated and experienced lawyers, accountants, and other business advisers. *See* Amended Joint Pretrial Order, Statement of Undisputed Facts ¶ 26.

2. When Kiam acquired the Patriots in October 1988, he was Chairman, Chief Executive Officer, and owner of all of the voting stock of Remington Products, Inc., the world's second largest manufacturer of electric razors. He also owned other businesses. *See* Amended Joint Pretrial Order, Statement of Undisputed Facts ¶ 3.

### Structure of the NFL

3. The NFL consists of 30 independently owned member clubs who co-produce the entertainment product "NFL football." Tr. at 839–843 [4] (Paul Tagliabue), 358–359 (Norman Braman).

4. The NFL member clubs jointly produce an annual season of NFL games leading to a series of playoff games that culminate each year in the determination of a Super Bowl champion. Tr. at 840 (Tagliabue).

5. It is the Commissioner's responsibility, *inter alia*, to oversee the business operations of the League, to represent the League and the clubs in dealings with third parties, and to ensure the integrity of the games and of the competition on the football field itself. Tr. at 843–844 (Tagliabue).

6. The NFL Constitution and Bylaws is the basic agreement among the member clubs, which along with all resolutions passed by the members, and policies and procedures implemented by the Commissioner, set forth the structure and organization of the League, as well as some of the "ground rules" the clubs will follow in conducting their joint business. Tr. at 841–843 (Tagliabue).

7. As early as May 1989, League procedures provided that approval of a sale "may be conditioned on such additional terms as the Commissioner, the Finance Committee, or the membership deems appropriate." NFL Document Entitled "Procedures for Prospective Sellers...." Dated May 24, 1989 (Exhibit 4 in Defendants' [1995] Motion for Summary Judgment on Plaintiffs' Claims).

8. NFL member clubs share approximately 90% of the total revenues earned by the League and its teams. Tr. at 845 (Tagliabue).

9. The NFL negotiates with each network broadcasting NFL games national television contracts on behalf of all NFL clubs. Tr. at 262 (Kiam).

10. The national television revenues are shared equally among each of the member clubs, regardless of whether they are located in a metropolitan area such as New York, or in a smaller community such as Green Bay, Wisconsin. Tr. at 262 (Kiam), 844–845 (Tagliabue).

11. Between fifty and sixty percent of the revenues earned by the NFL member clubs and shared equally among them are derived from the NFL's contracts with its national television broadcasters. Tr. at 845 (Tagliabue).

12. The location of NFL clubs is a factor that affects the success of all of the clubs collectively because location affects attendance and television viewership. Tr. at 847–88 (Tagliabue).

13. Television viewership could suffer if an NFL team moved out of a major market such as the Boston area. Pinchbeck Dep. at 97 (Plaintiffs' Exhibit 14 in Sup-

---

4. "Tr. at ___" at refers to the Trial Transcript of the duress trial which was held beginning on April 5, 1999.

port of Declaration of Mark Levinstein, Opposing Summary Judgment On The Merits). Tr. at 358 (Braman).

14. NFL football is a successful product because, *inter alia*, the quality of the competition on the field is very close, and because it involves teams that represent their communities in a way that arouses competition and rivalry against the other teams. Tr. at 840 (Tagliabue).

15. The Super Bowl is commonly the number one rated program on television. Tr. at 840–841 (Tagliabue).

16. Article 4.3 of the NFL Constitution and By-laws prohibits any club from "transfer[ring] its franchise or playing site to a different city" without first obtaining League approval. 1988 NFL Constitution and By-laws, Art. 4.3; Tr. at 847 (Tagliabue).

17. The rules and procedures by which the NFL controls the location, and relocation, of the member clubs promote fan interest in NFL football by *inter alia*, preserving and enhancing the relationship between NFL clubs and their communities and by fostering fan loyalty to individual teams. Tr. at 861–863 (Tagliabue), 357–359 (Braman).

18. The League relocation rules further ensure that problems for which an individual club owner is responsible cannot be a justification for a franchise relocation. Without such protection, the League would (and in the past has) faced severe criticism for allowing a club to move. Tr. at 869–870 (Tagliabue).

19. The location of NFL clubs is one of the most important factors that affects the success of all of the clubs collectively. This is because the choice of markets in which the clubs will operate and how they relate to each other is a very big factor in terms of television, in terms of attendance, and in terms of coverage of the entire United States. Tr. at 847–88 (Tagliabue).

20. It is important for the NFL to have clubs in the larger metropolitan cities, because the clubs depend upon the television and ticket revenues earned from the larger markets. A move of a team from a large city to a small city hurts the entire League. Tr. at 358 (Braman).

21. The NFL has a policy of requesting releases from departing owners, and this policy has been applied to selling owners who had no interest in relocating. Tr. at 900–01 (Tagliabue), 1089 (Moyer).

22. This policy was adopted in response to litigation initiated by former NFL club owners. Tr. at 900 (Tagliabue), 1089 (Moyer).

23. The NFL has an interest in enhancing the relationship between NFL clubs and their communities and fostering fan loyalty to individual teams. Tr. at 861–863 (Tagliabue), 357–359 (Braman).

### Kiam's Purchase of the Patriots

24. In October 1988, Kiam purchased a 51% interest in the New England Patriots for approximately $85 million. Tr. at 56 (Kiam); 856–857 (Paul Tagliabue).

25. When Kiam purchased his interest in the Patriots, he signed a written agreement promising to comply with "all NFL rules and policies as now in effect or as hereafter amended," and further promising to "obtain advance approval by the NFL of any transfer" or sale of a franchise ownership interest. September 13, 1988 Letter Agreement (Defendants' Exhibit 16 to Materials In Support of Defendants' Motion for Summary Judgment on the Merits of Plaintiffs' Antitrust Claims).[5]

26. At the time Kiam purchased the Patriots, he was aware of the following:

- The Patriots were committed to a lease which provided that they would play football in Foxboro, Massachusetts through the 2001 football season. Tr. at 243 (Kiam).

5. Hereinafter "Defendants' Ex. ___."

- The lease that was in place was disadvantageous to the Patriots because it allocated a major portion of the stadium revenues to the stadium lessor, not to the team. Tr. at 48–49, 241–242 (Kiam).
- The company that owned the stadium was in bankruptcy. Tr. at 59, 246 (Kiam).
- Kiam would have to agree to go forward with Fran Murray as his partner and to grant Murray the right to force Kiam later to purchase his 49% interest in the club. Tr. at 56, 81, 255, 258 (Kiam).
- The Patriots had a long history of losses and were "completely out of money." Tr. at 45 (Kiam). The team was having financial difficulties. Tr. 235–236 (Kiam).
- Kiam's financial advisors forecasted that the Patriots would continue to have operating losses for at least a few years after his purchase of the club. Tr. at 408 (Robert Romano).
- Foxboro Stadium was old and in an undesirable location. Tr. at 45–48, 243–244 (Kiam).
- 16 prior persons had considered buying the team and decided not to do so. Tr. at 49 (Kiam).

27. The NFL did not force Mr. Kiam to purchase the Patriots. Mr. Kiam himself made that decision. Tr. at 233 (Kiam).

28. The NFL had nothing to do with the amount that Kiam paid to purchase the Patriots (approximately $85 million). Tr. at 233 (Kiam).

29. When Kiam purchased his interest in the Patriots, he borrowed $15 million by pledging approximately $100 million in his Remington stock as collateral. Tr. at 234–235 (Kiam). *See* Amended Joint Pretrial Order, Statement of Undisputed Facts ¶ 9.

30. When he bought an ownership interest in the Patriots, Kiam expressly agreed to abide by the League's Constitution and Bylaws, as well as the League's relocation rules and procedures. *See* Amended Joint Pretrial Order, Statement of Undisputed Facts ¶ 8; Defendants' Trial Exhibit 96 (1988 Letter Agreement), Tr. at 56–57 (Kiam), 857–859 (Tagliabue).

31. In a May 22, 1991 agreement, Kiam reconfirmed his agreement to abide by the League relocation rules and procedures. *See* Plaintiffs' Trial Exhibit 190 and Tr. at 79–80 (Kiam).

32. After he bought the Patriots, Kiam entered a bid to buy the Foxboro stadium out of bankruptcy, but the bid was unsuccessful and Kiam never purchased the stadium. Tr. at 60–61, 246–247 (Kiam).

### Kiam's Efforts to Relocate the Patriots

33. The League assisted Kiam in his efforts to find a stadium solution in New England. Tr. at 66 (Kiam).

34. In 1990, Kiam told the Commissioner of the NFL that he might want to relocate the Patriots outside of New England because it did not look like he was going to get a new stadium in New England. Tr. at 66–67 (Kiam), 864–866 (Tagliabue).

35. Commissioner Tagliabue wrote Kiam a letter (through Kiam's attorney Emil) in December 1990 telling him that if he wanted to move the Patriots, the issue should be discussed at a League meeting. Defendants' Trial Exhibit 172 (Defendants' Ex. 23.) A League meeting to discuss the issue was never held, and Kiam never requested such a meeting. *See* Tr. at 873–877 (Tagliabue), 728 (Emil).

36. At the time Kiam was considering relocating the Patriots, the Patriots were suffering from a serious public relations problem arising from an incident involving reporter Lisa Olsen which caused a wave of bad publicity for the team. Tagliabue Dep., 12/11/98, at 60 (Defendants' Ex. 25); Tagliabue Dep., 6/22/95, at 68 (Defendants' Ex. 26).

37. It was the job of the Patriots' financial advisor to consider a potential reloca-

tion to anywhere that the Patriots could move. Tr. at 447 (Romano).

38. Baltimore and Jacksonville were two of the cities that were seeking to obtain an NFL club through the NFL expansion process. Donald Weiss Dep. at 43, 97 (Defendants' Ex. 27).

39. In April and May of 1991, Patriots representatives met with persons from Jacksonville and Baltimore to explore potential relocation of the club. Tr. at 437–438 (Romano), Tr. at 523–524, 541–542 (Samuel Jankovich).

40. TDJ Inc. wanted to own an interest in any NFL franchise that came to Jacksonville, whether it be an expansion team or a relocating team. Tr. at 554–555 (Jankovich), 694–695, 697 (Hamilton Jordan), Thomas Petway Dep. at 47–49 (Defendants' Ex. 8); David Seldin Dep. at 114–115 (Defendants' Ex. 4).

41. As of April of 1991, when representatives of the Patriots met with people in Jacksonville, Kiam did not intend to give TDJ Inc. an ownership interest in the team. Tr. at 507 (Timothy Smith), 564 (Jankovich).

42. Representatives of Jacksonville were concerned that if Kiam tried to relocate the Patriots, it would be difficult for the Patriots to get out of the lease at Foxboro Stadium. Thomas Petway Dep. at 318.

43. The Patriots and the persons and entities with whom they were negotiating in Jacksonville did not reach a final deal on the terms of a Patriots' proposed relocation. Tr. at 519 (Timothy Smith), 587 (Jankovich).

44. Kiam's first priority was to stay in New England. This fact was repeatedly set forth in a newspaper column authored by Jankovich, the Chief Executive Officer of the Patriots. The newspaper in which this was published was a newspaper of general circulation. Tr. at 523, 588 (Jankovich).

45. On May 22, 1991, in connection with League approval to increase the Patriots' debt limit, Mr. Kiam signed an agreement with the NFL committing that he would not relocate the Patriots through at least the end of the 1993 season. Tr. at 79–80, 185–186 (Victor Kiam); See Plaintiffs' Exhibit 190 (Plaintiffs' Additional Fact No. 70).

46. In May 1991, Kiam felt that his financial circumstances required that he agree to maintain the team in New England because at that time he needed an increase in the Patriots' debt limit to continue to fund the operation of the Patriots. Tr. 75–80 (Kiam) (Plaintiffs' Additional Fact No. 72).

47. Having signed the May 22, 1991 agreement, Kiam halted his discussions with Jacksonville representatives. Kiam Dep., 2/15/95, at 112 (Defendants' Ex. 13).

48. Baltimore had initiated a policy whereby it would not negotiate with an existing NFL club until, *inter alia,* that club had made an unequivocal decision to leave its home territory. Tr. at 633–634 (Belgrad).

49. In the Spring of 1991, Baltimore temporarily put on hold its discussions with the Patriots when it learned the Patriots were going to make further efforts to secure a stadium in New England. Tr. at 641–643, 651–652 (Belgrad).

50. The Patriots never informed anyone from Baltimore that they had reached an irrevocable decision to leave New England. Tr. at 644, 651–652 (Belgrad).

51. NFL President Neal Austrian told Memphis representatives that if they had the intent of buying and then immediately moving the Patriots to Memphis it was unlikely that they would get the required League votes necessary to do so. Tr. at 1026–1027 (Austrian).

52. During Mr. Kiam's ownership of the team, he never submitted to the NFL an application to relocate the New England Patriots. Tr. at 728 (Emil).

*The Patriots' Stadium Lessor Was Opposed to A Relocation*

53. The Patriots' stadium lessor claimed to have an operating covenant by which he could and would keep the team in Foxboro through the 2001 season. Robert Kraft Dep. at 61–64, 67–68, 73–74 (Defendants' Ex. 12), Tr. at 580–581 (Samuel Jankovich).

54. In general, the stadium lessor put on notice anyone with whom the Patriots were negotiating that they were interfering with the Patriots' lease at Foxboro. Robert Kraft Dep. at 79–81 (Defendants' Ex. 12).

55. The minority owner of the team, Fran Murray, also may have opposed a relocation of the team from Massachusetts. Tr. at 578–580 (Samuel Jankovich).

*The NFL's Interest in Maintaining the Patriots in New England*

56. Between 1990 and 1992, Commissioner Tagliabue consistently told Kiam that a move of the club was not justified. Tr. at 869–870, 881–885 (Tagliabue). *See also* Austrian Dep., 6/22/95, at 54–55.

57. The Commissioner told Kiam that, in order for him to support relocating the club, there had to be a serious effort to get a new stadium in New England. Tr. at 867–872 (Tagliabue).

58. As of April 1991, the Commissioner felt that the Patriots had not made a serious and sustained effort to get a new stadium in New England. Tr. at 880–881, 946–949 (Tagliabue).

59. New England was a critical television viewing area for NBC because it was the largest television market not shared with CBS, in which NBC broadcast NFL games. Tr. at 870–871 (Tagliabue); Dep. of Bud Adams 66–67.

60. The NFL had entered into a new contract with NBC beginning with the 1990 season. NBC informed the NFL that it was their view that a move of the Patriots out of New England would be a breach of the television contract. Tr. at 870–871 (Tagliabue); Tr. at 1018 (Austrian).

61. In order to maintain the League's television income, the Commissioner thought it was important during the period of the NBC contract to maintain stability in the location of its franchises. Tr. at 876–77 (Tagliabue); Tr. at 723 (Arthur Emil).

62. Between the 1990 and 1993 NFL seasons, television revenues increased from $17 million per club to $40 million per club. Tr. at 883–884 (Tagliabue).

63. Commissioner Tagliabue testified that he was opposed to relocation because national television revenues were increasing and would provide more revenue to the Patriots, and because Kiam had mismanaged the team, and because Kiam had not made adequate efforts to stay in New England. Tr. at 880–886, 895–896 (Tagliabue).

*Kiam's Management of the Patriots*

64. Victor Kiam had removed himself from the management of the Patriots. Tr. at 562–563 (Samuel Jankovich).

65. Just two years prior to Kiam's purchase of the club, the Patriots had gone to the Super Bowl. Tr. at 248 (Kiam), 867 (Tagliabue).

66. During Kiam's ownership of the team, the team consistently had losing records; one year the team's record was one win and fifteen losses. Tr. at 249 (Kiam); Tr. at 570 (Jankovich).

67. During Kiam's ownership of the team, attendance fell significantly. Tr. at 251–253 (Kiam).

68. During Kiam's ownership of the Patriots, the team's player and coaching expenses were too high, and the team was not being managed properly. Tr. 565–569 (Jankovich). *See* also Tr. at 254–255 (Kiam).

69. The Patriots had 3 different coaching staffs over Kiam's 3½ year period of own-

ership. Buying out the contracts of dismissed coaches cost the Patriots millions of dollars. Tr. at 253 (Kiam), 567–569 (Jankovich).

70. In 1988–90, because of significant cash shortfalls and the Patriots' debt burden, Kiam took several million dollars from his Remington income to fund the Patriots.

71. The monies that Kiam took out of Remington to fund the Patriots complicated the problems Remington was having in meeting its obligations to its lenders, including its obligation to pay down its working capital line. *See* Amended Joint Pretrial Order ¶ 13.

72. In June of 1991, at the insistence of Remington's lenders, Kiam signed an agreement with the Remington lenders that made all of Remington's outstanding loans due in full on May 31, 1992, and required the appointment of an investment banker from Chase Manhattan Bank to seek a transaction, including a sale of Remington, to enable the Remington lenders to be paid in full by May 31, 1992. *See* Amended Joint Pretrial Order ¶ 14.

73. In July of 1991 Fran Murray, the minority owner of the Patriots, exercised an option (the "put") that required Kiam to buy out Murray's interest in the Patriots within 90–120 days for approximately $35 million or lose control of the team. *See* Amended Joint Pretrial Order ¶ 15.

74. On November 11, 1991, Kiam and Murray agreed to extend the period within which Kiam had to pay Murray for his "put" to May 15, 1992. *See* Amended Joint Pretrial Order ¶ 16.

### The General Release Signed by Kiam

75. The NFL had instituted the policy of requiring releases from departing owners due to a bad experience it had faced. Pursuant thereto, it had requested and obtained releases from individuals selling their interests in the Minnesota Vikings, a club that never sought to relocate. Tr. at 901–03 (Tagliabue), 1089–90 (Moyer).

76. The NFL first requested a release from Kiam in early 1992, between March and early May. Tr. at 784–785 (Devine), 1090–91 (Moyer).

77. On March 18, 1992, Kiam agreed to sell his interest in the Patriots to North Sports Holdings, Inc., a company owned by James Orthwein. *See* Amended Joint Pretrial Order ¶ 18.

78. On April 1, 1992, the NFL membership approved Kiam's proposed sale of his interest in the Patriots "contingent on closing the transaction between Mssrs. Kiam and Orthwein and final approval by the Commissioner of all documentation relating to the transfer." *See* Amended Joint Pretrial Order ¶ 19.

79. At the time the NFL requested a release from Kiam, he had already agreed to sell the Patriots to James Orthwein. Tr. at 98 (Kiam), Kiam 1995 Dep. at 13, 21.

80. On May 8, 1992, Kiam signed the Release on behalf of himself and the other plaintiffs in favor of the NFL and its member clubs. *See* Amended Joint Pretrial Order ¶ 20.

81. The Release that Kiam signed includes an exception that would have allowed him to bring a relocation lawsuit in certain circumstances. Specifically, the Release provides that if the NFL allowed the Patriots' next owner, Orthwein, to relocate the Patriots prior to 1995, Kiam could have sued the NFL. Tr. at 204 (Kiam), 909–12 (Tagliabue), 1120–21 (Moyer).

82. The Release provides as follows (**emphasis supplied**):

GENERAL RELEASE OF CLAIMS BY VKK CORP.

VKK PATRIOTS, INC.

VICTOR K. KIAM II

1. **VKK Corp., VKK Patriots, Inc., and Victor K. Kiam II,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, do, for and on behalf of each of themselves and each of their respective

past, present, and future officers, directors, attorneys, servants, representatives, insurers, employees, shareholders, subsidiaries, affiliates, partners, predecessors, principals, heirs, executors, administrators, trustees, beneficiaries, agents, successors, and assigns (hereinafter collectively referred to as the "Releasors"), **hereby release and forever discharge the National Football League,** its officers, directors, attorneys, servants, representatives, insurers, employees, **subsidiaries, affiliates, partners,** predecessors, principals, heirs, executors, administrators, trustees, beneficiaries, agents, **successors, and assigns,** and **each Member Club of the National Football League** (other than KMS Patriots L.P.), their officers, directors, attorneys, servants, representatives, insurers, employees, **subsidiaries, affiliates, partners,** predecessors, principals, heirs, executors, administrators, trustees, beneficiaries, agents, **successors,** and **assigns (collectively, the "Releasees")** of and from any and **all past or present or, if based, in whole or in part, on facts,** actions, **claims or matters existing** or occurring from the beginning of the world **to the date of this Release, future claims,** demands, obligations, suits, damages, levies, executions, judgments, debts, charges, actions, or **causes of action, at law or in equity,** whether arising by statute, common law, or otherwise, both direct and indirect, **of whatever kind** or nature **arising out of or in any way relating to the Releasors' ownership interest in KMS Patriots L.P.,** save and except therefrom only (i) claims asserted against Releasors by Zeke Mowatt, Robert Perryman and/or Patrick J. Sullivan arising out of any matter encompassed in that certain lawsuit styled *Lisa Olson v. Victor Kiam et. al.,* Case No. 91–2710–A, Suffolk County, Commonwealth of Massachusetts, Superior Court Department of the Trial Court, and (ii) claims, other than **claims under federal or state antitrust laws (which are hereby released),** arising out of a League decision to approve a relocation of the KMS Patriots L.P. NFL franchise or playing site to a location outside of New England prior to January 1, 1995; *provided that* Releasors recognize that Releasees do not waive, compromise, or in any way *diminish* any rights or defenses available to them under the NFL Constitution & Bylaws or otherwise.

2. The Releasors specifically and expressly contemplate that this Release **covers known and unknown claims** for unknown as well as known damages, claims for anticipated an unanticipated damages, and claims for expected and unexpected consequences of both known and unknown damages.

3. In entering into this Release, the Releasors represent that they have proceeded with the advice of an attorney of their own choice, that they have read the terms of this Release, that the terms of this Release have been fully and completely read and explained to them by their attorneys, and that those terms are fully understood and voluntarily accepted by them.

4. This Release shall be construed and interpreted in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, Releasors have executed this Release this *8* day of May, 1992.

83. Kiam testified that enforcement of the Release would bar his claims. *See, e.g.,* Tr. at 133.

### Kiam's Sale of the Patriots

84. On May 11, 1992, Kiam sold his interest in the Patriots to North Sports Holdings, Inc. for approximately $106 million, an amount that allowed him to discharge various pressing financial obligations (such as his obligations to Fran Murray, the minority owner of the Patriots, and to IBJ Schroder Bank for the loan collateralized with Kiam's Remington stock). *See*

Amended Joint Pretrial Order, Statement of Undisputed Facts ¶ 21, 23.

### Kiam's Actions Following the Sale of the Patriots

85. Approximately two-and-a-half months after signing the Release, Kiam sent the NFL a letter stating that he "certainly would welcome [the] opportunity" to rejoin the NFL if that opportunity arose. Tr. at 221 (Kiam), Defendants' Trial Ex. 399.

86. More than thirty months after signing the Release, Kiam filed the instant lawsuit.

### Facts Relevant to Jacksonville Jaguars, Ltd. (f/k/a Touchdown Jacksonville, Ltd.)

87. Touchdown Jacksonville, Ltd. ("TDJ, Ltd.") was formed on or about October 1, 1991, as a limited partnership. Seldin Affidavit ¶ 3.

88. In October 1993, the NFL awarded an expansion franchise to TDJ, Ltd. Seldin Affidavit ¶ 12.

89. In December 1993, TDJ, Ltd. changed its name to "Jacksonville Jaguars, Ltd." and filed a certificate with the Secretary of State of Florida to this effect. Seldin Affidavit ¶ 12.

### PART AND PARCEL

The Plaintiffs seek to void the Release on the ground that it was "part and parcel" of the alleged antitrust conspiracy. For the reasons below, the Court rejects this attempt to escape the effect of the Release.

■ A general release negotiated by experienced businessmen with sophisticated legal counsel will bar federal statutory claims, including antitrust claims. See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 347, 91 S.Ct. 795, 810, 28 L.Ed.2d 77 (1971) (stating that the scope of a release of antitrust claims is determined by the intent of the parties); Ruskay v. Waddell, 552 F.2d 392, 395 (2d Cir.1977) (holding that a release of federal securities law claims is enforceable); Ingram Corp. v. J. Ray McDermott & Co., 698 F.2d 1295, 1313 (5th Cir.1983) ("[A]n adequately drawn and validly executed release will bar antitrust claims.") (citing additional cases); Northern Oil Co., Inc. v. Standard Oil Co. of California, 761 F.2d 699, 705 (Temp.Emer.Ct.App.1985) (Metzner, J.) ("There is no public policy which prohibits an otherwise valid release from operating to bar federal statutory causes of action.") cert. denied, 474 U.S. 821, 106 S.Ct. 73, 88 L.Ed.2d 59 (1985).

Assuming arguendo that the part and parcel theory is viable, the undisputed evidence confirms that the Release here was, if anything, an "outgrowth," rather than an integral part, of the alleged conduct that Kiam challenges on the merits. Even under the authorities cited by the plaintiffs, such a release cannot be part and parcel of an antitrust conspiracy.

The genesis of the part and parcel theory appears to be dictum from a 1935 decision in which the Supreme Court refused to reach the part and parcel issue. Radio Corp. v. Raytheon Mfg. Co., 296 U.S. 459, 56 S.Ct. 297, 80 L.Ed. 327 (1935). In that case, filed at law, the defendant sought to force the case into a court of equity. The Supreme Court expressly refused to address plaintiffs' argument that its release "was so connected with the unlawful combination and monopoly as to be inoperative at law." See id. at 462, 463, 56 S.Ct. 297. The Court held that "a court of equity must decline at this stage to adjudicate the validity of the release ..., leaving that issue along with others to adjudication at law." Id. at 463, 56 S.Ct. 297.

The majority of courts to address the part and parcel theory have declined to apply it. The Third Circuit, for example, has held: "[W]e are not able to imagine any meaningful way in which the obtaining of a release could be, in appellant's own words, 'part of and in furtherance of the continuing conspiracy among the defendants about which plaintiffs complain.'" Taxin v. Food Fair Stores, Inc., 287 F.2d

448, 451 (3d Cir.), *cert. denied,* 366 U.S. 930, 81 S.Ct. 1651, 6 L.Ed.2d 389 (1961). The Fifth Circuit reached the same conclusion, declining to "usher[ ] in that day" when a plaintiff could bring an antitrust claim notwithstanding its having signed an otherwise valid release. *Ingram Corp. v. J. Ray McDermott & Co.,* 698 F.2d 1295, 1315 (5th Cir.1983). And in *Northern Oil Co. Inc. v. Standard Oil Co. of California,* 761 F.2d 699 (Temp.Emer.Ct.App.1985), Judge Metzner rejected the part and parcel theory, expressly refusing to accept plaintiffs' argument that *Ingram* (or any other case) "provided another means in addition to a fraudulent inducement claim to attack the validity of a release." *Id.* at 706.

■ For a release to be part and parcel of an antitrust conspiracy, it must be obtained through coercion or duress caused by the defendants' conspiracy. *See, e.g., Raytheon,* 296 U.S. at 460, 56 S.Ct. 297 (plaintiffs allege that " 'because ... of the illegal duress' imposed by the monopoly, [they] were compelled ... to execute a release"). Plaintiffs fail to identify any case in which a court even considered a part and parcel claim in the absence of duress. Plaintiffs rely only on *dictum* in *Traffic Scan Network, Inc. v. Winston,* 1993–2 Trade Cas. § 70,414 (E.D.La.1993). But the plaintiff in *Traffic Scan* alleged "that the release was presented to it at the 'eleventh hour' and was finally executed only because there was no alternative." *Id.* at 71,195. Given that the jury in the duress trial rejected such allegations on the facts here, *Traffic Scan* offers no support for the plaintiffs' attempt to invoke the part and parcel theory in the absence of duress or coercion.

■ In addition, "if the release is merely an outgrowth, rather than a cause, of the violation, it cannot be part of any ... scheme" that would bar its enforcement. *Northern Oil,* 761 F.2d at 706. *Accord*

*Ingram,* 698 F.2d at 1315; *see also, e.g., Dobbins v. Kawasaki Motors Corp.,* 362 F.Supp. 54, 58 (D.Or.1973) (to invoke the "part and parcel theory," the release must be "an *object* of the combination or conspiracy ... or an *integral part* of the scheme") (emphasis supplied). Thus, even if there were some legal basis for the part and parcel theory, and even if economic duress were proved, a plaintiff would also have to establish that the release bears a "special or unusual relation ... to the general conspiracy." *Taxin,* 287 F.2d at 451. *Accord S.E. Rondon,* 288 F.Supp. at 882; *California Concrete Pipe Co. v. American Pipe & Constr. Co.,* 288 F.Supp. 823, 828 (C.D.Cal.1968).[6] The undisputed evidence precludes such a finding here.

● The conduct that Kiam claims harmed him occurred well before the release was ever sought. *See, e.g.,* Kiam 1995 Dep. at 152 ("The release actually took place a year later than those conversations" between the NFL and Jacksonville representatives.).

● The release was sought only after Kiam had entered into a contract committing that he would not move the club until after the 1993 NFL season unless the NFL approved. *See* Trial Tr. at 186 (Kiam) (Question: "And you committed that the Patriots would continue to play their home games in New England through at least the 1993 NFL season; did you not?" Answer: "That is correct sir."). *See generally, e.g., Taxin,* 287 F.2d at 451 ("In simple logic a release given on [May 8, 1992] could not facilitate any restraint of trade which had already been accomplished.").

● The release was sought pursuant to a policy that was associated with sales of club ownership (not relocation), and had previously been applied to selling owners who had no interest in relocat-

---

**6.** For example, in *Carter v. Twentieth Century–Fox Film Corp.,* 127 F.Supp. 675 (W.D.Mo. 1955), the release was literally part of an allegedly illegal lease, so that if the lease was deemed unlawful, the release would also have been unlawful.

ing. *See* Tr. at 900–01 (Tagliabue), 1088–89 (Moyer).

- The release was sought only after Kiam had already agreed to sell the Patriots. "[B]y the time that [Kiam] first learned that had the National Football league wanted a release, [he] had already reached an agreement to the material terms of [the] transaction ... to sell the Patriots to Mr. Orthwein." Kiam 1995 Dep. at 13; *see id.* at 21 ("... we had finalized everything ... the details were done, we were ready to sign.").

The plaintiffs argue that because the NFL has a policy of obtaining releases in order to limit antitrust litigation, the Release is void because it is an "integral part" of a larger conspiracy to prevent NFL teams from relocating. However, every release is designed to prevent litigation, and releases are often sought in order to limit particular classes of liability. It goes too far to argue that a policy of obtaining releases transforms an otherwise valid release into a legal nullity. Even if the Court were to accept the part and parcel theory, it finds no precedent supporting such a broad expansion of the theory's reach.

In short, the Release was not obtained until the sale transaction had closed, after which Kiam was powerless to relocate the Patriots, *not* because of any conspiracy, but rather because he no longer owned the club. Therefore, the Release could not have been an "integral part" of a conspiracy to keep the Patriots from relocating out of New England. The Release was at most "merely an outgrowth, rather than a cause," of the alleged conspiracy. As in virtually every other case to address the "part and parcel theory" in the last fifty years, summary judgment for the defendants thereon will be granted.

## CONSIDERATION

■ The plaintiffs assert that the Release is unenforceable because Kiam received no consideration for its execution.

This Release provides that it shall be construed and interpreted in accordance with New York law.

Under N.Y.Gen.Oblig.Law § 15–303 (McKinney 1999), a "written instrument which purports to be a ... release of all claims ... shall not be invalid because of the absence of consideration...." In the Southern District of New York, courts have applied Section 15–303 to enforce releases of federal statutory claims. *See, e.g., von Grabe v. Ziff Davis Publishing Co.,* 1995 WL 688912 (S.D.N.Y.1995) (release of federal RICO claim); *Binstein v. Haven Indus., Inc.,* Fed.Sec.L.Rep. ¶ 96,-585, at 94,494 (S.D.N.Y.1978) (release of federal securities claim); *Mittendorf v. J.R. Williston & Beane, Inc.,* 372 F.Supp. 821, 834 n. 8 (S.D.N.Y.1974) (same). Nevertheless, the plaintiffs argue vigorously that New York law should not apply because the Release waives a federal statutory claim.

The Court need not tarry on this issue because the plaintiffs indisputably received valuable consideration for signing the Release. In exchange for executing the Release, Kiam received the NFL's consent to transfer ownership of the Patriots. *See, e.g., Brock v. Entre Computer Ctrs., Inc.,* 933 F.2d 1253, 1261 (4th Cir.1991) (consent to franchise transfer adequate consideration for release). The NFL's approval enabled plaintiffs to receive $106 million to settle their debts and obligations.

The plaintiffs argue that approval of the sale cannot constitute adequate consideration because the League had already voted to allow the sale to go forward when the NFL Commissioner requested a release from Kiam. This argument finds no support in the record. League procedures provided that approval of a sale "may be conditioned on such additional terms as the Commissioner, the Finance Committee, or the membership deems appropriate." Therefore, the League had no obligation to allow the sale to go forward if

Kiam refused to abide by the Commissioner's request for a release.[7]

The Court finds that the plaintiffs received adequate consideration for executing the Release.

## JACKSONVILLE JAGUARS, LTD.

With respect to Jacksonville Jaguars, Ltd., Kiam alleges that "upon information and belief, they agreed to refrain from negotiating with the plaintiffs about relocating the Patriots to Jacksonville in exchange for favored treatment in the NFL expansion process."

Jacksonville Jaguars, Ltd., as a member club of the NFL, is covered by the Release signed by plaintiffs on May 8, 1992 and could not possibly be responsible for any alleged conspiracy to interfere with plaintiffs' efforts to relocate the Patriots, and the undisputed evidence confirms, Kiam's assertion to the contrary, that Jacksonville Jaguars, Ltd. did negotiate with the Patriots over a possible relocation to Jacksonville in January and February 1992.

### A. As a Member Club of the NFL, Jacksonville Jaguars, Ltd. Is Covered by the Release

■ In the General Release of Claims, dated May 8, 1992, Kiam "release[d] and forever discharge[d] the National Football League, its ... successors, and assigns, and each Member Club of the National Football League (other than KMS Patriots L.P.), their ... affiliates, partners, predecessors ... successors, and assigns...."

There is no dispute that Jacksonville Jaguars, Ltd. is a member club of the NFL. It is also an "affiliate[ ], partner[ ], and ... successor[ ]" to the NFL and the 28 other NFL clubs that were members of the League at the time the Release was signed.

■ The parties used broad, general language to identify the NFL and its member clubs as beneficiaries of the Release. Rather than identifying each member club separately, the Release refers generally to the NFL and to "each Member Club of the National Football League"; this demonstrates that the Release was intended to cover all member clubs of the NFL, including member clubs at the time any "future ... claims" might be brought by the plaintiffs. Moreover, the Release provides only for a single member club exception to its scope—an exception for KMS Patriots, L.P. The governing principle of contract interpretation—*expressio unius est exclusio alterius*—reinforces and confirms the conclusion that there are no other exceptions to the Release. *See, e.g., Israel Discount Bank Ltd. v. Gottesman* (In re Ore Cargo, Inc.), 544 F.2d 80, 82 (2d Cir.1976); *IBM Poughkeepsie Employees Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 590 F.Supp. 769, 773 n. 19 (S.D.N.Y.1984) ("Under the doctrine of *expressio unius est exclusio alterius*, when certain persons or categories are specified in a contract, an intention to exclude all others may be inferred.") Thus, the plain, unambiguous language of the Release confirms that Jacksonville Jaguars, Ltd. is within its scope.[8]

7. Kiam cannot argue that the Commissioner's right to set conditions on the approval of a sale constituted an unfair surprise. When Kiam purchased his interest in the Patriots, he signed a written agreement promising to comply with "all NFL rules and policies as now in effect or as hereafter amended," and further promising to "obtain advance approval by the NFL of any transfer" or sale of his franchise interest. The league procedures allowing the Commissioner to impose conditions on sale were already established in May 1989, approximately three years before Kiam signed the Release. In addition, the NFL membership's approval of the sale was ex-

pressly contingent on "final approval by the Commissioner of all documentation relating to the transfer."

8. It is black letter law that the meaning and interpretation of the terms of a release are issues for the Court to decide as a matter of law where, as here, the language is unambiguous, and even if ambiguous, there is no relevant extrinsic evidence that would create a genuine issue of fact. *See Nycal Corp. v. Inoco PLC*, 988 F.Supp. 296, 298–99 (S.D.N.Y.1997), *aff'd*, 166 F.3d 1201, 1998 WL 870192 (2d Cir.1998); *see also Chock Full*

Moreover, Jacksonville Jaguars, Ltd. is plainly a successor to the NFL and/or to the 28 predecessor member clubs. Jacksonville Jaguars, Ltd. was created by the NFL and the other member clubs—out of their own rights and assets—by affording Jacksonville Jaguars, Ltd. a fractional share of the NFL joint venture, a fractional share of each club's attendant rights and obligations, and a fractional share of each club's players and player contracts. Therefore, under this additional plain language of the Release, Jacksonville Jaguars, Ltd. falls within its scope.[9]

On the issue of contract interpretation, one further point warrants mention. Given the nature of the League joint venture and the extent to which each club's success depends upon the financial strength of the others (see Tr. at 356–359 (Norman Braman)); (Tr. at 849–851, 856 (Paul Tagliabue)), it would be illogical, if not irrational, to conclude that the NFL representatives would have agreed to a release that allowed Kiam to bring a treble damage antitrust action against an expansion club, thereby achieving indirectly what he could not achieve directly by a suit against the League's other partners. By the same token, it would be irrational to assume, given the evidence of record, that Kiam sought to preserve such a claim against an entity of which he was not even aware at the time he executed and delivered the Release.

## B. Even if There Had Been An Agreement To Interfere With The Patriots' Efforts to Relocate to Jacksonville, It Must Have Occurred Prior To The Creation of Jacksonville Jaguars, Ltd. (f/k/a TDJ, Ltd.)

■ The undisputed record evidence establishes that: (a) there was no conspiracy between the NFL and anyone else to interfere with Kiam's efforts to relocate the Patriots to Jacksonville, Florida, and (b) there was no agreement between the NFL and anyone else that Jacksonville would terminate negotiations with the Patriots regarding relocation. See, e.g., David Seldin Dep. at 201–203, 205–206; Tr. at 519–520 (Timothy Smith); Tr. at 682–683 (Donald Weiss); Tr. at 701–702 (Hamilton Jordan); Tr. at 891–892 (Paul Tagliabue); Tr. at 1016–1017 (Neil Austrian); Tom Petway Dep. at 314, 323–324.

Even if the plaintiffs could establish such an agreement, Jacksonville Jaguars, Ltd. could not possibly have been a party to it. On May 22, 1991, Kiam agreed in writing that he would not relocate the Patriots until after the 1993 NFL season. Kiam testified under oath that after May 22, 1991, he stopped pursuing efforts to relocate the Patriots to Jacksonville because of that agreement. See Victor Kiam Dep., 2/15/95 at 112 ("Q: Did you pursue the interest of the folks in Jacksonville after May 15, 1991 or May 22, 1991? A: Not that I recall. Q: Why not? A: I had signed an agreement. Q: That's the [May 22, 1991] agreement that we looked at as Exhibit 2. A: Yes."). The Jacksonville Jaguars, Ltd. was not even created until *four* months later. Accordingly, in view of Kiam's own testimony, Jacksonville Jaguars, Ltd. could not possibly be responsible for Kiam's participation in the May 22, 1991 agreement or have caused Kiam any injury (*i.e.*, because after he signed the agreement, Kiam no longer pursued Jacksonville.).

In order to impose liability on Jacksonville Jaguars, Ltd. as a "late-arriving co-conspirator," plaintiffs must establish that

---

*O'Nuts Corp. v. Tetley, Inc.*, 152 F.3d 202, 204 (2d Cir.1998).

**9.** Plaintiffs have sued TJ, Ltd., an entity that was formed in late 1993, as a result of the merger of two entities: Touchdown Jacksonville Partners, Ltd. and TJ, Ltd. *See* First Amended Complaint para. 4 (defining "TJ,

Ltd." as the sole remaining entity of the merger that took place in the fall of 1993); David Seldin Dep. at 75. TJ, Ltd. did not come into existence until long after Kiam sold the Patriots in May 1992. For this reason alone, summary judgment should be granted in favor of TJ, Ltd.

Jacksonville Jaguars, Ltd. actually entered the alleged conspiracy and intended to pursue its objectives. *See Katz v. Dansker (In re Investors Funding Corp. of N.Y.Sec.Litig.)*, 523 F.Supp. 550, 557 (S.D.N.Y.1980) ("late-arriving co-conspirator [required to] actually have entered the conspiracy and intended to pursue its objectives"). But given Kiam's May 1991 contractual commitment not to relocate the team for the next three NFL seasons and his decision in May 1991 "not to pursue the interest of the folks in Jacksonville," there were no ongoing conspiratorial objectives for Jacksonville Jaguars, Ltd. to pursue. As a result, Jacksonville Jaguars, Ltd. cannot be held liable as a so-called late-arriving co-conspirator.

It would have been impossible for Jacksonville Jaguars, Ltd., which did not exist until September 1991, to have had any connection with the "other" alleged co-conspirators—the NFL, its member clubs or Jacksonville Jaguars, Ltd.—prior to May 1991, the only period during which an alleged conspiracy to interfere with the Patriots' efforts to relocate to Jacksonville could have been effective. Thus, plaintiffs cannot offer a single evidentiary fact to support their claims against Jacksonville Jaguars, Ltd.

Indeed, plaintiffs' allegation of a conspiracy involving Jacksonville Jaguars, Ltd. is most clearly refuted by the evidence that plaintiffs did *not* introduce at trial. Under oath, at a deposition taken by plaintiffs, the President of Jacksonville Jaguars, Ltd. testified that Jacksonville Jaguars, Ltd. did not enter into an agreement with the NFL not to negotiate with the Patriots.

*See* Seldin Dep. at 202 ("Q: To your knowledge did Touchdown Jacksonville, Ltd. agree with anyone at the National Football League at any time that they would not negotiate with the Patriots regarding the relocation of the Patriots to Jacksonville? A: No.").

Seldin further testified that *in January and February of 1992*, Jacksonville Jaguars, Ltd. *did* engage in negotiations with the Patriots. At that time, Seldin met with Romano, the Patriots' Chief Financial Officer, to discuss the terms of a possible relocation of the team to Jacksonville. *See* Seldin Dep. at 107–124.[10] And, when David Seldin brought this fact to the attention of Neil Austrian, the president of the NFL, Austrian told Seldin that Jacksonville Jaguars, Ltd. was "welcome to do whatever was in [its] best interest with respect to the possibility of a transaction with the Patriots." *See* Seldin Dep. at 129. *See also id.* at 130 (Austrian "seemed perfectly happy to have us talk with them.").[11]

Plaintiffs have failed to—and in light of the foregoing evidence, could not possibly—submit a single evidentiary fact which in any way links Jacksonville Jaguars, Ltd. to the claimed agreement that is the basis for their antitrust claims.

For the reasons above, the Court will grant summary judgment for Jacksonville Jaguars, Ltd. on the claims asserted against it.

### All Claims in the First Amended Complaint are barred by a General Release thereof.

The defendants have moved for summary judgment on all claims asserted in plaintiffs' First Amended Complaint on the

---

**10.** *See also* Seldin Dep. at 159:

Q: Has Mr. Petway ever told you that Touchdown Jacksonville would not engage in negotiations with the New England Patriots without the permission of the NFL?
A: No, in fact, under his direction I did [engage in such negotiations].

**11.** Seldin further testified that Jacksonville Jaguars, Ltd. determined that its pursuit of the Patriots in early 1992 would not jeopardize its chance to obtain an expansion fran-

chise, and that Jacksonville Jaguars, Ltd.'s subsequent decision to terminate discussions with the Patriots was based not on an agreement with the NFL, but rather on, *inter alia,* "uncertainty about what the [Patriots'] intentions were, our concern about the financial performance of the team and the losses that would have to be honored in its existing situation, concern about how we were going to fund the transaction." *See* Dep. at 137–139.

ground that said claims are covered by the General Release executed and delivered on May 8, 1992 in favor of the NFL and its member clubs. The plaintiffs unsuccessfully attempted to invalidate the Release on the grounds that it was executed and delivered by plaintiffs while plaintiffs were under economic duress caused by the National Football League ("NFL") and its member clubs and was part and parcel of the alleged conspiracy of the NFL asserted in said complaint.

On April 16, 1999, the issue of such economic duress having been duly tried before the Court and a jury and the jury having duly rendered its verdict that the plaintiffs herein were not under economic duress caused by the NFL and its member clubs, a Final Judgment was thereupon duly entered accordingly in favor of the NFL and its member clubs named herein.

The Court thereupon considered the claim of plaintiffs herein that the Release was "part and parcel" of an alleged antitrust conspiracy and found, as indicated previously herein, that there is no legal basis for such theory or basis in the facts of this case and that the NFL and its member clubs are to be granted summary judgment in their favor dismissing said claims.

### Conclusion

The Court is satisfied that the antitrust and other claims in the First Amended Complaint are covered and fully met by the General Release as to all defendants covered by the Release, who include Jacksonville Jaguars, Ltd., and summary judgment accordingly is granted to the said defendants on the merits.

So Ordered